WIGHTMAN, Respondent, v. GRAND LODGE ANCIENT ORDER OF UNITED WORKMEN OF MISSOURI, Appellant.

St. Louis Court of Appeals, December 11, 1906.

1. **EVIDENCE: Opinions of Witnesses: Insanity.** The opinions of non-professional witnesses as to the mental condition of a person, whose contract is in issue, are admissible in evidence where such witnesses give the facts upon which they base their opinions.

2. ————: **Mutual Benefit Societies: Cancellation of Certificate: Admissions of Officer.** In an action on a benefit certificate in a mutual benefit society, where the defense was a withdrawal from the order, and an issue arising in the case was whether the deceased was insane at the time of his withdrawal, the declarations of the financial officer of the defendant, who took an active part in procuring the withdrawal card for the insured, concerning the mental condition of the insured, were admissible as tending to show that entire good faith was not exercised by the officers of the lodge in cancelling the obligation and issuing the withdrawal card.

3. ————: **Burden of Proof: Insanity.** Where one insured in a mutual benefit society applied for and procured a withdrawal card from the officers of the lodge, in an action by his beneficiary after his decease on the certificate thus cancelled, after proof of insanity, the burden was upon the defendant lodge to show that no advantage was taken of the insane person, the insured, and the contract of withdrawal was fair and made in good faith.

Appeal from St. Louis City Circuit Court.—*Hon. James E. Withrow*, Judge.

AFFIRMED.

*Frederick H. Bacon* for appellant.

(1) If, when Thomas Wightman applied to appellant for a final card withdrawing from the order and accepted such final card, he understood the nature of the

transaction and the effect of his acts, his acts are valid, and binding and the respondent cannot avoid them. Cutler v. Zollinger, 117 Mo. 101; McKissick v. Groom, 148 Mo. 469; State ex rel. v. Grand Lodge A. O. U. W., 78 Mo. App. 556; Wells v. Ben. Assn., 126 Mo. 637; Wharton & Stille's Medical Jurisprudence, sec. 1. (2) Until the death of Thomas Wightman, respondent had no property nor interest in the benefit certificate, nor any rights that could be asserted. Thomas Wightman was the sole party in interest, he had the right to withdraw at any time, and his act in withdrawing from membership in appellant order was binding upon respondent, Hofman v. Grand Lodge, 73 Mo. App. 47, and cases cited; R. S. 1899, sec. 1417.

*O. B. Givens* and *W. B. Homer* for respondent.

(1) There was no error on the part of the court in refusing to transfer the case to the equity docket. Goodson v. Accident Assn., 91 Mo. App. 351. (2) Opinions of non-experts, in regard to the sanity of a party, are proper when accompanied with the facts upon which their opinions are based. Crowe v. Peters, 63 Mo. 434; State v. Bryant, 93 Mo. 299; Appleby v. Brock, 76 Mo. 316; Sharp v. Railroad, 114 Mo. 100; Baldwin v. State, 12 Mo. 234. (3) The court should have instructed the jury to find a verdict for the plaintiff, for the reason that the final card was not issued in the manner and form provided for by the by-laws of the order. R. S. 1899, sec. 1417; Grand Lodge v. O'Mally, 114 Mo. App. 191; Grand Lodge v. Ross, 89 Mo. App. 621; Seehorn v. Catholic Knights, 95 Mo. App. 233. (4) There was abundance of evidence sustaining the verdict and tending to show that Thomas Wightman was insane. Woodmen of the World v. Broadwell, 114 Mo. App. 471; Wells v. Ben. Assn., 126 Mo. 630; Meier v. Buchter, 94 S. W. 883.

BLAND, P. J.—Action upon a benefit certificate for two thousand dollars, issued by appellant to Thomas

Wightman for the benefit of respondent. The petition sets forth that the defendant is a fraternal beneficiary corporation, and issued the benefit certificate in question to plaintiff, with the understanding that the plaintiff would thereafter pay the dues and assessments made by defendant against said Thomas Wightman, and that plaintiff did pay such assessments, avers the death of Thomas Wightman, a compliance with all the laws of the order and that at the time of his death he was a member in good standing; that proofs of death have been made and defendant refused to pay.

The answer denies each and every allegation of the petition, admits that defendant is a fraternal beneficiary association, admits the issuing of the certificate, denies that Thomas Wightman was at the time of his death a member in good standing in the order because he had withdrawn from the same. The answer then sets forth that the benefit certificate in question was issued on March 5, 1902, and that it was provided by the by-laws of said order that any member in good standing could sever his connection with the order by paying all charges against him, surrendering his benefit certificate in writing together with all rights, benefits and privileges that he may have acquired by virtue of his membership, when a final card shall be issued to him by the Grand Lodge. That Thomas Wightman delivered to the defendant an application for final card, which was approved by the subordinate lodge of which he was a member, and also delivered to defendant on October 29, 1903, an affidavit to the effect that the benefit certificate in question was beyond his control but he released the order from all obligation thereon. That the said application and affidavit and statement of the action of the lodge were delivered to defendant, November 5, 1903, which, in accordance with the request and its by-laws, issued to Thomas Wightman and he accepted, a final card whereby said Thomas Wightman

severed his connection with the order, and the benefit certificate issued became and was void.

The reply of plaintiff after a general denial of the allegations in the answer, avers that Thomas Wightman on and prior to October 26, 1903, was of unsound mind and incapable of transacting business. That he had separated himself from his family, was embittered toward his son, the plaintiff, and was insane upon that subject. That the officers of the defendant at the time of the application in question knew that Wightman was insane, and that plaintiff had a vested right in the certificate. That the granting of the withdrawal card was irregular, because notice was not given to plaintiff, and the officers of defendant order, with intent to defraud the plaintiff, connived with and assisted Thomas Wightman to obtain said withdrawal card, knowing him to be insane. On the filing of the reply, appellant moved the court to transfer the case to the equity docket, which motion was denied and the cause was submitted to a jury, who, after hearing the evidence and receiving the instructions of the court, returned a verdict for respondent, on which judgment was rendered. The appeal is from this judgment.

Appellant, in support of the defense set forth in the answer, introduced the following documentary evidence:

"Law 146. *Final Card, How Obtained.*—Any member in good standing may sever his connection with the order by paying all dues, fines and assessments charged against him, surrendering his beneficiary certificate in writing, together with all rights, benefits and privileges that he may have acquired by virtue of his membership in the order, when a final card shall be issued to him by the grand lodge without the payment of any fee for such final card."

"Ancient Order of United Workmen, Application for Final Card. Received Nov. 5, 1903.

"To Security Lodge, No. 44, A. O. U. W. of Missouri:

"Being desirous of severing my connection with the Ancient Order of United Workmen, I hereby present beneficiary certificate No. 3696 issued to me by the grand lodge of Missouri on the twenty-sixth day of March, 1902, and make application for a final card.

"I do hereby, for myself and those claiming by, through or under me, surrender and relinquish all the rights, benefits and privileges, of whatever character which now exist, or which may hereafter accrue under and by virtue of said beneficiary certificate, as well as by virtue of my membership in the Ancient Order of United Workmen. I agree that the date of said final card shall be the date of this application.

"THOMAS WIGHTMAN, Applicant."

(Seal.)

Security Lodge No. 44, A. O. U. W.

Onward and Upward. A. O. U. W.

Inst. Jan. 18, 1878, St. Louis, Mo.

Dated this 26th day of October, 1903.

Attest: A. H. YEO, Recorder Security Lodge, No. 44, A. O. U. W.

"To Grand Lodge A. O. U. W. of Missouri:

"I hereby certify that Brother Thomas Wightman is a member in good standing of Security Lodge No. 44 A. O. U. W., located at St. Louis, State of Missouri.

"That he has paid all assessments (including those now pending), dues and fines for which he is liable.

"That the last assessment paid by him was assessment No. 10, 1903.

"That he caused the above application for a final card to be made, signed the same in my presence, and presented therewith beneficiary certificate No. — which is attached hereto.

"That the above application was approved by the lodge at a meeting held on the twenty-sixth day of October, 1903, and the issuance of a final card recommended.

"Dated this twenty-sixth day of October, 1903.

"A. H. YEO, Recorder Security

(Seal.)                     Lodge No. 44, A. O. U. W.

"Security Lodge No. 44, A. O. U. W."

"Received Nov. 5, 1903.

"State of Missouri, City of St. Louis, ss.

"I, Thomas Wightman, a member of Security Lodge No. 44, A. O. U. W., having applied for a final card to withdraw from the order do solemnly swear that the benefit certificate (No. 3696), issued to me by the said A. O. U. W. is lost or beyond my control for which reason I am unable to deliver it to the order as requested, but hereby release the order from all obligations under said certificate.                     THOMAS WIGHTMAN.

"Subscribed and sworn to before me this 29th day of October, 1903.                     L. D. IMMELL,

"Notary Public.

(Seal.)          "My term expires August 15, 1906."

"Ancient Order of United Workmen.   No. 424.

FINAL CARD.

"This final card, granted to Brother Thomas Wightman of Security Lodge, No. 44, A. O. U. W. located at St. Louis, State of Missouri, for the purpose of severing his connection with the order, doth hereby certify, that he is a member of the order in good standing at this date, having paid all assessments, dues and fines charged against him or for which he is liable.

"That he has made proper application in writing for this card, and that the same is duly attested by the recorder of said Security Lodge No. 44 with the seal thereof attached.

"That he has furnished affidavit that his beneficiary certificate No. 3696 issued to him by the grand lodge of Missouri on the 26th day of March, 1902, is lost or beyond his control.

121 App—17

'That from and after the date of this card he has relinquished for himself, and those claiming by, through or under him, all the rights benefits and privileges which now exist or may in any way accrue to him or them under said beneficiary certificate or by virtue of his membership in the Ancient Order of United Workmen.

"That the date of this card is the 26th day of October, 1903, in accordance with the provisions of the application for said card.

"In testimony whereof the grand master workman and grand recorder of the grand lodge of Missouri, A. O. U. W. have affixed their names and the seal of said grand lodge this 5th day of November, 1903.

WM. H. MILLER,

"Grand Master Workman.

"HENRY W. MEYER,

"Grand Recorder."

" (Appearing on the above is the seal of the Supreme Lodge, A. O. U. W., of the Grand Lodge of Missouri, A. O. U .W., and of Security Lodge No. 44, A. O. U. W. )."

"Accepted upon the conditions herein specified
Signed by, Thomas Wightman, the applicant
for this card.

Attested by A. H. YEO, Recorder, Security
Lodge No. 44."

Henry W. Meyer, the grand secretary of appellant, testified he did not know Thomas Wightman and had never seen him to his knowledge. On the part of respondent, the evidence shows that Thomas Wightman, at the time of his death (December 5, 1903) was seventy years old, feeble and infirm, and had lived separate and apart from his wife for about six years prior to his death; that for a number of years he was secretary of the McLean Medicine Company of the City of St. Louis; that after his relations were severed with the McLean Company he was employed by the year by the

Ballard Snow Liniment Company to write advertisements, and continued in the employ of the latter company until a few weeks before his death. Respondent's evidence also tends to show, that a short time prior to his death, without any grounds or reason therefor, Thomas Wightman conceived the idea that his son (respondent) with two or three other persons, had entered into a conspiracy against him and defrauded him of a considerable amount of money, and that he entertained a bitter hatred for his son and these other persons.

James F. Ballard, proprietor of the Ballard Snow Liniment Company, testified he had known Wightman from twenty-two to twenty-five years prior to his death; that he was employed by his company the last seven or eight years preceding his death; that for eight or nine months before Mr. Wightman died "he began to show signs of an erratic method in things he did and seemed to have great hatred for two or three different people; one of them was Mr. Rowell, of Rowell & Ferriss, he seemed to have a great hatred for him and also for his son. . . . It was the things he did, and he seemed to forget, lose his mind, he was flighty, what he would say now in perhaps ten minutes he would say something different, altogether opposite, everything he said led to the point he was losing his mind. . . . He would say one thing and contradict it in a few minutes; the general lack of ability to connect his mind as he had previously done, as men should do under the same conditions, those were the facts that lead me to say what I am saying. . . . When Mr. Wightman came to work for me first he seemed to be a clear-headed man and had a good comprehension of what he was to do, and finally he became exactly the opposite. He seemed to forget and to not be in possession of this faculty as he previously had been. I do not wish to state anything that would prejudice the interests of any body. I am trying to make it clear. I am stating the

things in my language as they appear to me. He had all the apparent conditions which indicate a failing mind. . . . I saw a great difference in his mental condition from what it was when I first saw him. I am reciting it as a matter of fact, and because of those facts I got somebody else to do the work. . . . He told me, physically, he was unable to do the work. I think in this particular year, it was hot in September, and he said he would have to defer it until October, that he could not stand up under the work as he had in years past. . . . He said his son had defrauded him out of some property, said he had nothing to do with him, wouldn't have nothing more to do with him, spoke of him in bitter terms."

Charles H. McLean, president of the McLean Medicine Company, testified Wightman was secretary of that company from its organization until the latter part of January, 1894.

"Q. During the last years of Mr. Thomas Wightman's connection with the company what was his mental condition and characteristics? A. In trivial business matters, any that would arise, he was, I might say, extremely irritable, very difficult to work with, he being an official of the company, to such an extent that it was for that reason that I secured the service of another gentleman to take the place of Mr. Wightman as secretary of the company.

"Q. What manifestations, if any, of this irritability such as you speak of was there? A. Well, there was one manner of manifestation that impressed me forcibly, and that was that matters that were particularly trivial would annoy him to such an extent and irritate him to such an extent that he would on occasions slam his desk closed in the afternoon, and I might say slam himself out of the office and get away from everything.

"Q. State whether or not that increased toward the last of his service? A. Yes, sir, it did.

"Q. You were not connected with him after he ceased to be with your company, were you? A. No."

On October 8, 1903, Wightman had the following advertisement published in a daily newspaper in the City of St. Louis:

"Dr. J. H. McLean. By request: Will be published the history of the looting of his estate, and the J. H. McLean Medicine business. By Thos. Wightman, formerly manager of Dr. McLean's business, and secretary of the McLean Medicine Co. Date of publication will be announced in due time."

The evidence shows that Wightman was never the manager of Dr. McLean's business, and that neither the estate of Dr. McLean or the Medicine Company was ever looted or defrauded by any of its agents or officers, or any person connected with the business. Other witnesses for plaintiff gave it as their opinion, founded upon their acquaintance with, observation of, and conversations had with Wightman the latter part of the year 1903, that he was insane.

On October 8, 1903, F. W. Obermueller, an employee of respondent, at respondent's request offered a check to Willis Martin, the financial officer of the subordinate lodge to which Wightman belonged, in payment of his dues for the month of October. Witness said he had paid respondent's dues before.

Asked to state what conversation he had with Martin, witness said:

"I presented the check for payment and he said Mr. Wightman was not with them any more and I was surprised.

"Q. Go on and state what you said? A. I said to him, 'Are you not aware that William E. Wightman is taking care of Thomas Wightman's dues and assessments?' He says, 'We have nothing to do with William E. Wightman.' He went into detail, explaining how he brought it about. He said he wrote him he

wanted to discontinue his connection with the A. O. U. W., that he was not financially able to carry it on. He said he would have to take it up with the A. O. U. W., and he found out he would have to take out a last card which he done. I said, 'That man must be crazy,' and he said, 'I think he is.' "

Respondent testified that in a conversation he had with Martin about the mental condition of his father, Martin stated he "thought my father was acting very peculiarly, he didn't see why he should do that" (deny respondent was his son). This evidence of both Obermueller and respondent was objected to on the ground that it was hearsay; that Martin was the mere financial officer of the lodge and had no official connection whatever with Wightman's withdrawal. To show that Martin took an active part in the withdrawal of Wightman, respondent introduced in evidence the following letter, found among Wightman's papers after his death, and admitted to be in Martin's handwriting, to-wit:

"St. Louis, Oct. 27, 1903.

"Mr. Thos. Wightman,

"Dear Sir and Brother: The resignation handed me by you was presented to the lodge last night that I might receive instructions that would justify me in refusing payment, if payment is offered me.

"In order that the order would be safe, and avoid legal entanglement, I am instructed to have you sign the inclosed application for final card, and also have you bring your certificate and surrender it. You will please sign this blank and date it Oct. 28 or 29 where x is marked.

"If your certificate is lost or beyond your control you must make affidavit to that effect.

"Fraternally,

"WILLIS H. MARTIN."

No expert evidence on the question of Wightman's sanity was offered by either party. On May 12, 1902,

Wightman made his last will in favor of respondent (his son) and appointed him executor of his estate without bond. Appellant objected to all the evidence offered by respondent, touching the sanity of Wightman, on the ground that it was incompetent, for the reason it came from non-professional witnesses, and at the close of respondent's evidence offered a pre-emptory instruction to find for appellant. On the overruling of this request appellant offered Albert H. Yeo as a witness in rebuttal. Yeo was the recorder of Security Lodge A. O. U. W., of which Wightman had been a member, and testified as follows:

"Q. Did you see Mr. Wightman personally? A. Yes, sir; I did.

"Q. Now, when did he first come to you in regard to the matter? A. A few days before the card was issued.

"Q. What did he say? A. He came to my place of business.

"Q. State what he said? A. The first time he came to see me in regard to the card he stated he wished to withdraw from the order and presented me with this affidavit and with this application for the final card.

"Q. Did he sign them in your presence? A. Yes, sir; he did.

"Q. What did you do with the papers? A. I took them to the grand recorder's office.

"Q. Did you get this? A. The final card, yes.

"Q. State whether you presented that to him? A. I wrote him a letter to come to my place of businss to receive the card, which he did a few days later.

"Q. Did he sign it in your presence? A. Yes, sir.

"By the court: Q. How many times did you meet him three months before he died? A. I had not seen him for several months before this occasion.

"Q. You knew him? A. Yes, sir.

"Q. Had known him some time? A. Yes, sir. . . . I saw nothing unusual in his appearance or talk with me.

"Q. State whether or not he seemed to know what he wanted? A. Yes, sir."

1. No complaint is made of the action of the court in giving or refusing instructions, except error is assigned in the refusal of the court to peremptorily instruct the jury to find the issues for appellant. If the witnesses, who testified concerning the mental condition of Wightman, were competent, their evidence is clearly sufficient to warrant the jury to find Wightman was insane at the time he applied for and received his withdrawal card. These witnesses stated the facts upon which they based their opinions of Wightman's mental condition, and while their opinions may not be entitled to the same weight, and may possess less probative force than would the opinions of professional men on the facts related by the witnesses, yet their opinions were competent evidence to go to the jury for what they were worth (Sharp v. Kansas City Cable Ry. Co., 114 Mo. l. c. 100, 20 S. W. 93, and cases cited), and we think the court did not commit error in refusing the peremptory instruction.

2. Martin's letter to Wightman, alvising him to make an affidavit to the loss of the certificate of insurance, shows that he, as an officer of the lodge, took an active part in procuring the withdrawal card, and we think his declarations concerning the mental condition of Wightman at the time were admissible, as they tend to show, not that Wightman was actually insane but that entire good faith was not exercised by the officers of the lodge in getting rid of an obligation which in the course of nature would soon mature.

3. The appellant invokes the doctrine that a contract entered into by a person of unsound mind, not under guardianship, is not absolutely void but voidable

only, and that as respondent had no vested interest in the benefit certificate and only the insured had an interest in it, he had the right to withdraw at any time. When a person who has entered into a contract is shown to have been insane at the time, the burden is cast upon the other party to show at least two things, first, that no advantage was taken of the insane person and, second, that the contract is fair and was made in good faith. There is some evidence tending to show that entire good faith was not kept in the transaction between the order and Wightman, in respect to the issuance of the withdrawal card. The contract with Wightman by which he received the withdrawal card, if it may be called a contract, was not fair; on the contrary, it was very unfair, and while neither the insured nor the beneficiary had any vested interest in the certificate of insurance, yet the insured had a contractual interest in the certificate which the courts have always protected against the illegal, unjust and unfair action of the order issuing the certificate. Such certificates may be forfeited for non-payment of dues, for violations of the laws of the order, etc., and may be voluntarily surrendered by the member, but to effectuate a cancellation, fairness and a strict compliance with the laws of the order must be shown. The jury, on substantial evidence, found the certificate in question was not surrendered by fair means. The case was properly tried and we think a just result reached.

4. There was no error on the part of the court in refusing appellant's motion to treat the case as one in equity. It is strictly an action at law.

No reversible error appearing, the judgment is affirmed. All concur.